| | |
|---|---|
| STATE OF MINNESOTA | DISTRICT COURT |
| COUNTY OF DAKOTA | FIRST JUDICIAL DISTRICT |

Curt Sticha,

      Plaintiff,

v.                                            **SUMMONS**

Brandl/Anderson Homes, Inc,

      Defendant.

### THE STATE OF MINNESOTA TO THE ABOVE-NAMED DEFENDANTS:

1.    YOU ARE BEING SUED. The Plaintiff has started a lawsuit against you. The Plaintiff's Complaint against you is attached to this Summons. Do not throw these papers away. They are official papers that affect your rights. You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no Court file number on this Summons.

2.    YOU MUST REPLY WITHIN 21 DAYS TO PROTECT YOUR RIGHTS. You must give or mail to the person who signed this Summons a written response called an Answer within 20 days of the date on which you received this Summons. You must send a copy of your Answer to the persons who signed this Summons located at: <u>see addresses below</u>.

3.    YOU MUST RESPOND TO EACH CLAIM. The Answer is your written response to the Plaintiffs Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for In the Complaint, you must say so in your Answer.

4.    YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS. If you do not Answer within 21 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the Complaint If you do not want to contest the claims stated In the Complaint, you do not need to respond. A Default Judgment can then be entered against you for the relief requested in the Complaint.

5.    LEGAL ASSISTANCE. You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get

legal assistance. Even If you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case.

6.     ALTERNATIVE DISPUTE RESOLUTION. The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice.  You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

Dated: August 24, 2021

**SATRE LAW FIRM**

*[signature]*

Eric D. Satre, MN Bar No. 183015
Attorney for Plaintiff
INTERNATIONAL PLAZA
7900 International Drive
Suite 300-7044
Bloomington, MN 55425
Telephone: (651) 212-4919
Facsimile: (651) 212-4203
esatre@satrelaw.com
admin@satrelaw.com

**EXHIBIT A**

| | |
|---|---|
| STATE OF MINNESOTA | DISTRICT COURT |
| COUNTY OF DAKOTA | FIRST JUDICIAL DISTRICT |

| | |
|---|---|
| Curt Sticha, | CASE TYPE: EMPLOYMENT |
| Plaintiff, | |
| v. | **COMPLAINT** <br> JURY TRIAL DEMANDED |
| Brandl/Anderson Homes, Inc, | |
| Defendant. | |

Curt Sticha for his cause of action against Brandl/Anderson Homes, Inc., states and alleges as follows:

1. Plaintiff Curt Sticha (hereinafter "Plaintiff" or "Sticha") is an adult Minnesota resident.

2. Defendant Brandl/Anderson Homes, Inc., (hereinafter "Defendant" or " Brandl/Anderson" or "BAH") is a Minnesota Corporation, that is located at 221 River Ridge Circle South, Suite 100, Burnsville, MN 55337.

3. Plaintiff was hired by Brandl Anderson Homes (hereinafter, "BAH" or "Defendant") as a "Community Sales Associate". As part of his compensation package, he received a base salary with a bonus based on performance, health & dental insurance, cell phone plan, PTO days, fuel allowance, and a 401K with employer contribution. At this time, Mr. Sticha's real estate license was held with Value Reality, a brokerage owned by Defendant. Mr. Sticha's responsibilities included, but were not limited to: marketing, required model hours, meeting sales goals, and providing BAH with a variety of sales reports. As part of the employment agreement, it was required that Mr. Sticha "*Never* sell another builder's home."

1

EXHIBIT A

4. Upon employment, Mr. Sticha was assigned a Brandl/Anderson email address, csticha@brandlanderson.com. That email address was listed as Defendant's point of contact on all purchase agreements as well as the BAH website. Mr. Sticha's cell number & email were used on many marketing materials & the Parade of Homes' guidebook.

5. Early on in his employment with BAH, Mr. Sticha was trained to use a builder intranet system named IOHBA. That system was used to enter leads, enter buyer & agent information, and also to assign daily tasks to Mr. Sticha. In addition, when Mr. Sticha collected buyer information, he was directed to place that information he obtained in Defendant's information management system.

6. On or around September 13, 2011, BAH Sales Manager Scott Ervin approached Mr. Sticha while he was working in his assigned model home on behalf of Defendant. Mr. Sticha was informed that if he wished to maintain employment through BAH, he was to sign a document agreeing to move his real estate license to Edina Reality and that he would no longer receive a W2, but a 1099 instead. Mr. Sticha requested time to review the document but was denied and warned that if he did not sign it immediately, he would not have a job. Mr. Sticha was not provided with a copy of this document.

7. Following this transition, Mr. Sticha was no longer allotted PTO days, health & dental insurance, a fuel allowance, or a 401K; however, BAH's control over his day-to-day responsibilities did NOT change. Mr. Sticha was still required to conduct marketing, be present at his assigned model during specific hours, meet sales goals, and provide BAH with a variety of sales reports. Further, as detailed in the initial Employee Agreement, it was still required that Mr. Sticha never sell another builder's home.

EXHIBIT A

8.  As part of Mr. Sticha moving his license to Edina Realty, BAH agreed to pay transaction fees to Edina Realty. On or around April 16, 2019, BAH stopped paying these fees, in turn reducing Mr. Sticha's compensation.

9.  As time went on, Defendant's control over Mr. Sticha grew. Since his initial employment agreement, Defendant required Mr. Sticha be in the model during model hours, Thursday-Monday, 12-6pm. Mr. Sticha was eventually required to complete and provide weekly timecards. Mr. Sticha was also required to obtain approval from Defendant to take time-off as well as cover his model hours with an approved replacement.

10. Defendant's control extended to Mr. Sticha's designated days off (Tuesdays & Wednesdays). On those days Mr. Sticha was expected to respond to emails, calls & texts from Defendant. Further, Defendant required Mr. Sticha to be at all showings of his assigned model, spec homes, and ongoing builds. If these showings were outside of model hours, he was required to obtain written approval from Defendant prior to the showing.

11. The control BAH exercised over him was also obvious in the general duties assigned to Mr. Sticha. For example, he was responsible to generate Purchase Agreements, Miscellaneous Addendums, Change of Sales Price Addendums, and any other associated documentation required during the real estate transactions at BAH's direction. He was also required to collect and forward construction deposits and all non-refundable deposits in accordance with the policies and procedures of Defendant, and generate after-sale documentation in an accurate, timely and efficient manner.

12. Not only was Mr. Sticha required to fill out timecards on a weekly basis, he was also required to provide traffic reports each Sunday for review by the sales office. Mr. Sticha was

also directed to report to Defendant on where every "prospect is at in the buying process on a continual basis" so Defendant would have that real time information on every contact.

13. In addition to the weekly timecards, Mr. Sticha was required to produce many other reports to Defendant and assigned duties including, but not limited to:

- Reporting model traffic counts; monthly web leads; model inspection reports, and agent showing reports;
- Registering each visitor to the sales center/model and maintaining Defendants' customer database;
- Maintaining complete, detailed, organized and accurate record of all sales center activities and maintaining an organized and efficient buyer follow-up program between the sale and closing;
- Conducting after closing marketing contact in conformity with Defendant;
- Forwarding weekly, monthly, and quarterly reports as well as other sales related activity required by Defendant to Sales Management; and
- Maintaining a communication log for all customers.

14. BAH continued to assert complete control over Plaintiff, by placing doorbell cameras in the model homes and reviewed videos to ensure that Mr. Sticha was following their protocols regarding the production of required reports, specifically entering Parade of Homes traffic information into IOHBA.

15. The sales expectations and marketing plans were also managed by BAH. As a result, Mr. Sticha was required to regularly sign and return documents confirming his sales goals to BAH. Defendant also required Mr. Sticha to complete and provide to them, a "detailed marketing plan." Furthermore, Mr. Sticha was further told that if monthly sales goals were not

4

met, he would be required to provide a "plan to get that goal met and if you are not going to make it, why not."

16. Defendant also controlled and required Model and Spec Home maintenance consistent with an employment relationship. As a result, BAH required that Mr. Sticha perform tasks including shoveling the stairs and walkways of his assigned model home, providing seating and planters for front porch, wiping down front door and side lights, and watering plants at the model or spec home.

17. Likewise, the employer level of control was also exhibited on connection with company sales meetings. As a result, Mr. Sticha was required to attend mandatory sales meetings, which were scheduled outside of model hours (Thursday-Monday 12-6pm). Some of the mandatory sales meetings were off-sight at design centers, lumber yards, etc.

18. Furthermore, during Defendant's sales meetings, Mr. Sticha was to be prepared to discuss items such as "the outreach program you have in place to bring organic leads to the community." At times he was even required to do "homework" prior to these meetings and answer quizzes provided at that meeting the following day.

19. Similarly, employer level control was evident when BAH required Mr. Sticha to drive through routes where directional signs (to model) were placed to ensure that all signs were present and visible at their assigned locations. Mr. Sticha was required to do so on a weekly basis, outside of model hours. Then, during the bi-annual Parade of Homes, Mr. Sticha was required to provide handwritten maps to Defendant with directions to his assigned model for that Parade.

20. On June 26, 2019, John Falk was hired as Vice President of Sales & Marketing for Defendant. On or around this time, Mr. Falk implemented an additional requirement that Mr. Sticha participate in "team group calls" as part of the 'BAH sales team'.

21. Mr. Sticha was the sole customer contact for BAH. As a result, he was instructed, in writing, that he was to tell the customers that "you are the person from start to finish to answer all questions. They may have construction questions that your job supt [sic.] needs to help you with, but you are 100% in control of the customer from the initial greeting to the showing."

22. Likewise, Mr. Sticha was verbally instructed that he would control the customer through the closing. Mr. Sticha was further directed to not provide contact information (email or cell phone number) of fellow BAH employees, including but not limited to John Faulk (VP of Sales and Marketing Jennifer Sexton (Sales Manager), and Jodi Linddrud (Customer Care Coordinator). The company instructed that: "<u>There is ONE point of contact with the customer and it is the sales agent</u> period."

23. Defendant showed further control when Mr. Sticha was assigned certain spec homes by the Defendant in which he was directed to "be the buyers and sign prints and surveys to confirm the meeting took place and that plans are what was selected on the RSO's and change orders and garage side correct." He was also required to review the survey for garage side, flat, LO or WO sites, driveway pitch and size, etc. Mr. Sticha was required to complete this additional work as "standard procedure on all of these specs and future specs going forward to ensure they had supplied the correct information to the project managers to build the homes." In addition, he was instructed to complete the paperwork and turn it in for a file in the company office.

24. Mr. Sticha was further required to complete plan reviews for the spec homes for pre-construction, predrywall and final walk-through in all the communities Mr. Sticha was responsible for with written responses/reports required by Defendant.

25. Defendant also unilaterally reduced commission/compensation for Plaintiff even after the work was performed. For example, during an offsite build, after Mr. Sticha executed a

EXHIBIT A

Purchase Agreement representing BAH, Dave Anderson (owner of BAH) reduced Mr. Sticha's commission by changing the payout from 3.5% to 1.5%. When Mr. Sticha objected, he was informed that if he disagreed, he would be cut out of any future opportunities to work on offsite builds.

26. Throughout his time working under the management of John Falk, Mr. Falk controlled Mr. Sticha through bullying and attempts to create fear, often screaming and swearing during phone calls. Similarly, in May of 2020, Mr. Falk took Mr. Sticha's listing at 20380 Gresham Way, Lakeville, MN 55044 away and gave it to another employee with no explanation.

27. Mr. Sticha was abruptly terminated on September 8, 2020 in a one-minute phone call from Mr. Falk. At that time, Mr. Sticha had an appointment with customers he had previously been working with to sign a Purchase Agreement to begin building a new home. Mr. Sticha was forced to hand that transaction over to another employee of BAH, even though the brunt of the sales work had already been performed.

28. After Mr. Sticha was 'let go', he was no longer provided access to the BAH database, including his email account. At the same time, he was required to continue his ongoing duties including acting as primary customer contact for the remaining 15 home builds under contract, weekly meetings with the job superintendent, and routine walk throughs of homes under construction. Further, BAH required that Mr. Sticha be present at every home tour requested by all customers and he continued to maintain those responsibilities until his final closing on April 12, 2021.

EXHIBIT A

## COUNT I
## FAILURE TO REPORT REQUIRED STATEMENT OF EARNINGS BY EMPLOYER VIOLATION OF MINN. STATS. §181.032

Plaintiff alleges and incorporates herein by reference the allegations in the preceding paragraphs.

29. For the final period Plaintiff worked for Defendant, Defendant failed to provide payment for hours worked and did not provide Plaintiff, their employee, an earnings statement containing his hours worked, either in writing or by electronic means, covering that or any pay period.

30. As a direct and proximate result of the acts alleged above, Plaintiff has suffered and continues to suffer damages including, but not limited to economic and emotional distress.

## COUNT II
## FLSA AND MFLSA VIOLATIONS
## 29 U.S.C. § 201 ET. SEQ., AND MINN. STATS. §§177.24 AND 177.25

Plaintiff alleges and incorporates herein by reference the allegations in the preceding paragraphs.

31. At all times relevant hereto, Defendants have been, and continue to be an "employer" engaged in interstate commerce and/or in the production of goods for commerce, within the meaning of the Fair Labor Standards Act, 29 U.S.C. § 203 (hereinafter "FLSA"). At all relevant times, upon information and belief, Defendants have had gross operating revenues in excess of $500,000.00.

32. The FLSA requires each covered employer, such as Defendant herein, to compensate all non-exempt employees at a rate of not less than one- and one-half times the regular rate of pay for work performed in excess of forty hours per work week. Likewise, the Minnesota Fair Labor Standards Act requires each covered employer, such as Defendant herein, to

compensate all non-exempt employees at a rate of not less than one- and one-half times the regular rate of pay for work performed in excess of forty-eight hours per work week.

33. Defendant, pursuant to its policies and practices, failed and refused to pay minimum wages for hours worked to Plaintiff for many of the periods he worked.

34. By failing to provide Plaintiff with lawful minimum wage compensation, Defendants have violated the FLSA, 29 U.S.C. § 201 et seq. and Minn. Stats. §§177.24 and 177.25.

35. The foregoing conduct, as alleged herein, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a) and the MFLSA.

36. Among other remedies, Plaintiff seeks damages in the amount of his respective unpaid regular time and overtime compensation, liquidated damages as provided by the FLSA, 29 U.S.C. § 216(b), interest, and such other legal and equitable relief as the Court deems proper and just.

## COUNT III
## VIOLATION OF MINNESOTA STATUTES §181.101

Plaintiff alleges and incorporates herein by reference the allegations in the preceding paragraphs.

37. Defendant failed to pay Plaintiff within a 31-day period as required by Minnesota Statutes §181.101.

38. Defendants willfully intended not to abide by proper payroll accounting procedures described in preceding paragraphs.

39. By the actions described in the preceding paragraphs, fraud was committed against Plaintiff, State, and Federal agencies for which Defendant is responsible.

EXHIBIT A

40.    As a direct and proximate result of this failure to provide wages in a timely manner defendant is subject to a 15-day daily wage penalty as described in 181.101(a), as well as Plaintiffs fees and costs under Minn. Stats. §181.171.

## COUNT IV
## UNJUST ENRICHMENT

Plaintiff alleges and incorporates herein by reference the allegations in the preceding paragraphs.

41.    Defendant made false representations to State and Federal agencies regarding Plaintiff's status as an independent contractor resulting in unjust enrichment by all Defendants through not making the requisite employer contributions for Plaintiff and not complying with the employers' portion of contributions corresponding to a proper calculation of wages and overtime.

42.    Defendant used Plaintiff as an employee and then transferred his work on sales in process to an agent of their own choosing without any compensation to Plaintiff even though defendant continued to require work from Plaintiff until his last recognized sale closed. As a result, Plaintiff lost sales that were near completion due to Defendant claiming it had dismissed Plaintiff while at the same time it maintained control over Plaintiff.

43.    Defendant also willfully intended to engage in illegal payroll accounting procedures described in preceding paragraphs. Defendant unfairly benefited from those practices at the expense at the expense of Plaintiff.

44.    Defendants unjustly enriched themselves at the expense of Plaintiff by the underpayments as well as the failure to pay payroll taxes due for Plaintiff's work.

45.    As a direct and proximate result of this action, Plaintiff suffered and continues to suffer loss of income and loss of future earning capacity.

EXHIBIT A

## COUNT V
## MISREPRESENTATION OF EMPLOYMENT RELATIONSHIP – (MINN. STAT. § 181.722)

Plaintiff repeats, realleges, and incorporates all preceding paragraphs as if fully set forth herein.

46. Pursuant to Minn. Stat. § 181.722, subd. 1, "[n]o employer shall misrepresent the nature of its employment relationship with its employees to any federal, state, or local government unit; to other employers; or to its employees."

47. For purposes of Minn. Stat. § 181.722, subd. 1, "[a]n employer misrepresents the nature of its employment relationship with its employees if it makes any statement regarding the nature of the relationship that the employer knows or has reason to know is untrue and if it fails to report individuals as employees when legally required to do so."

48. Pursuant to Minn. Stat. § 181.722, subd. 2, "[n]o employer shall require or request any employee to enter into any agreement, or sign any document, that results in misclassification of the employee as an independent contractor or otherwise does not accurately reflect the employment relationship with the employer."

49. During the period, Plaintiff performed work for remuneration paid by Defendant, and said work was carried out subject to its direction and control. Despite the foregoing, Defendant knowingly, intentionally, and willfully misrepresented the nature of its employment relationship with Plaintiff and misclassified him as an independent contractor or otherwise failed to accurately reflect his employment relationship with Defendant.

50. By failing to properly identify and classify Plaintiff as an employee, and inaccurately classifying him as an independent contractor and/or otherwise failing to accurately reflect the employment relationship, Defendant violated of Minn. Stat. §§ 181.722.

EXHIBIT A

51. As a proximate result of Defendant's violations of Minn. Stat. § 181.722, Plaintiff has suffered damages as set forth herein.

## COUNT VI
## VIOLATION OF MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT (MINN. STAT. § 325D.44)

Plaintiff repeats, realleges and incorporates the preceding paragraphs as if fully set forth herein.

52. Pursuant to the Minnesota Uniform Deceptive Trade Practices Act, a business engages in a "deceptive trade practice when, in the course of business, vocation or occupation," it engages in any conduct that "creates a likelihood of confusion or misunderstanding." Minn. Stat. § 325D.44, subd. 1(13).

53. As set forth in the preceding paragraphs, in an effort to avoid providing sales representatives, including Plaintiff, the benefits and protections he is entitled to under Minnesota law, Defendant has knowingly, intentionally and willfully misclassified him as an independent contractor despite the fact that the relationship between Defendant and Plaintiff was actually one of employer/employee.

54. Defendant's conduct in misclassifying Plaintiff and the other sales employees, constitutes a deceptive trade practice, and thus constitutes a violation of the Minnesota Uniform Deceptive Trade Practices Act.

55. As a proximate result of Defendant's violation of the Minnesota Uniform Deceptive Trade Practices Act, Plaintiff has suffered damages in that Defendant has obtained valuable property, money and or services from them, and has deprived them of rights and benefits guaranteed by law. Accordingly, Plaintiff is entitled to injunctive relief restraining Defendant from

EXHIBIT A

engaging in such deceptive trade practices in the future, and to recover the costs and attorney's fees they have incurred in obtaining such injunctive relief.

## COUNT VII
## DECLARATORY RELIEF

Plaintiff repeats, realleges, and incorporates all preceding paragraphs as if fully set forth herein.

56. An actual controversy has arisen between the Plaintiff on the one hand, and Defendant, on the other hand, relating to the following matters:

a. Whether Defendant has unlawfully misclassified Plaintiff as independent contractor, and have thus denied Plaintiff the common benefits of employee status, such as

    i. wages and overtime;

    ii. holiday pay;

    iii. workers' compensation;

    iv. unemployment insurance;

    v. contributions to Defendant's retirement plan;

    vi. income tax withholding; and

    vii. meal, break and rest periods

b. Whether Defendant has unlawfully failed to pay benefits and compensation owing in a timely manner to Plaintiff and whose employment with Defendant ended, as required by Minnesota law;

c. What amounts Plaintiff is entitled to receive in compensation and benefits;

d. What amounts Plaintiff is entitled to receive in interest on unpaid compensation due and owing; and

EXHIBIT A

e.  What amounts Plaintiff is entitled to receive from Defendant in statutory penalties and interest.

57. Plaintiff seeks entry of a declaratory judgment in his favor which declares Defendant's practices as heretofore alleged to be unlawful, and which provides for the recovery of all sums determined by this Court to be owed by Defendant to Plaintiff.

**WHEREFORE,** On the full Complaint Plaintiff prays for judgment against Defendant for recession and declaratory relief was well as further damages as follows:

1. An Order enjoining Defendants from continuing the unlawful practices described herein;

2. Declaratory relief that Plaintiff was an employee pursuant to applicable law;

3. Compensatory damages according to proof;

4. Liquidated damages pursuant to the PWA and/or MFLSA;

5. Reasonable attorneys' fees and costs of suit;

6. Pre and post judgment interest as provided by law; and

7. Such other and further relief that the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38.01 of the Minnesota Rules of Civil Procedure, Plaintiffs hereby demands a trial by jury on all claims so triable.

Dated: <u>August 24, 2021</u>

SATRE LAW FIRM

*/s/ Eric D. Satre*

Eric D. Satre, MN # 183015
Attorney for Plaintiff
INTERNATIONAL PLAZA
7900 International Blvd
Suite 300-7044

EXHIBIT A

Bloomington, MN 55425
Telephone: (651) 212-4919
Facsimile:  (651) 212-4203
esatre@satrelaw.com
admin@satrelaw.com

## ACKNOWLEDGMENT

Plaintiff, by and through the undersigned, hereby acknowledge that sanctions, including costs and disbursements, and reasonable attorney fees may be awarded pursuant to Minnesota Statutes, sec. 549.211 et seq. to the party against whom the allegations in this pleading are asserted.

Dated: August 24, 2021

Eric D. Satre (Atty. Id. # 183015)

**EXHIBIT A**